[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiffs brought this action under the Connecticut Unfair Trade Practices Act, Connecticut General Statutes 42-110a et seq. Pursuant to Connecticut Practice Book 87 and 88, the court (Aronson, J.) ordered the matter to proceed as a class action comprised of persons who were tenants of defendant Prestia between November 1, 1980 and July 12, 1983 at 58 Beaver Street, 54 Beaver Street or 161 Broad Street, New Britain. Summary judgment on the issue of liability was rendered for the plaintiffs by Judge Goldstein. Notice of the pendency of this lawsuit was given to members of the plaintiff class by publication with an opportunity for those who wished not to be bound by the judgment to "opt out" of the class. No one exercised that option.
The court heard testimony over 16 days from fifteen tenants of these properties. Although memories were understandable dimmed by the passage CT Page 5733 of almost a decade, particularly with regard to dates, the testimony of the tenants with regard to the conditions of their apartments was largely corroborated by the testimony of the New Britain Health Director and the Chief Sanitarian for the City of New Britain, both of whom had visited the Beaver Street properties during the period at issue and one of whom did inspections of the Broad Street property. In addition, the testimony of John Merino lends support to the testimony of the tenants at 54 and 58 Beaver Street who testified with regard to the mechanical and structural inadequacies of their units.
Connecticut General Statute 42-110g(a) allows one who has suffered an "ascertainable loss of money or property" as a result of an unfair trade practice to bring an action to recover actual damages. See Conaway v. Prestia, 191 Conn. 484, 493 (1983). The Supreme Court held in Conaway that plaintiffs "must present sufficient evidence to enable the trier to ascertain with reasonable certainty the diminution of the rental value occasioned by the defendants' wrongful conduct."191 Conn. at 495. The parties stipulated that, over the thirty-three month period involved here, defendants collected $142,000 in rents for these properties. The Conaway court indicated in footnote 12 that actual damages could be determined by subtracting the reasonable use and occupancy value of the units from rents received.
The parties, not unexpectably, differ in the method appropriate to calculate a reasonable use and occupancy value. Plaintiffs' witness, Edward Schwartz, proferred an opinion that the rental rate ought to be lowered by the cost to repair the housing code violations which he estimated to be $480 to $500 per unit per year. He also testified, however, that the lack of a certificate of apartment occupancy does not lower rental value of a unit, but increases it. Defendant's witness, Thomas Ringrose, testified that rents in the Beaver Street area were traditionally higher than those in better areas because expenses of those buildings are higher. Landlords try to recoup their investments faster because of the depreciating value of such buildings. Defendants argue that since the rents received by them were less than the use and occupancy value of the premises, the plaintiffs have suffered no damages. Although Mr. Ringrose did not inspect the properties in question during the period covered by this litigation, he testified that rentals in the area of these properties for four room flats with heat ranged from $195 — $200 monthly in 1981, $200 — $220 in 1982 and $215 — $240 in 1983. Members of the class testified that rent for their units ranged from $150 per month to $250 per month over the period from 1980 through 1983. Most of the tenants at 161 Broad Street testified that rent in 1981 was $225, in 1982 was $225 — $230 and in 1983, $240. The Beaver Street tenants who testified regarding rent were charged $250 per month in 1982 and 1983. The rent receipts produced by defendant on the whole corroborated the tenants' testimony. Using Ringrose's figures, in 1981, tenants were charged at least $25 per month more than the reasonable use and occupancy value of their units; for 1982, at least $5 to $10 more and for 1983, $10 per month more. Because of the conditions of the units, the court CT Page 5734 finds the lower figure of the range more appropriate as the reasonable value for use and occupancy. Based on that, Ms. Ciccolella overpaid defendant $115, Ms. Centeno $30, Ms. Ortiz $280, Ms. Corrido $70, Ms. Medina $360, and Ms. Cole $360.
The plaintiffs' theory for determining the value of use and occupancy proferred through Mr. Schwartz is not persuasive. His theory which entails discounting the average rental by the cost to repair is not generally accepted as a measure for valuing reasonable use and occupancy. While it might make sense if the tenant were asked to assume the cost of repair, such was not the case here. In fact, Mr. Prestia did offer one tenant rent for two months if she fixed up an apartment which had suffered fire damage.
In addition to the losses occasioned by the excess rental charges, several members of the class had out of pocket expenses to alleviate the effects of the housing code violations with which they had to live. Ms. Miranda lost $500 in property due to a break-in attributable to the lack of locks on her windows, one of which was accessible from the fire escape. Ms. Alicia had to use an electrical space heater because of the inadequate heat supplied by the gas on gas system. She also spent some $12 per month on roach bombs for 18 months, totalling $216. Ms. Sanchez also testified that she spent $12 per week on roach bombs, one bomb per room. She is entitled to $12 per month for 26 months or $312. Ms. Corrido spent $10 per month for roach spray for 14 months or $140. Ms. Medina spent $4 for mouse traps and $6 monthly for roach spray, totalling $200. Ms. Santos spent at least $8 monthly for roach bombs. ($208 over 26 months) and lost some $250 in personal property due to burglaries attributed to faulty locks on her back door and windows.
Ms. Cole lost $25 in food due to a leak in her pantry wall, $50 in clothing due to rodent and roach damage and a $400 couch in which mice built a nest. She spent $4 monthly over 10 months for rodent poison and $24 monthly for roach bombs. Ms. Cole also spent $25 for a space heater because a broken window was not repaired, causing heat loss. Ms. Cole's actual damages total $400.
The court has no reason to doubt that some of the conditions about which the court heard testimony may be attributable to the actions of some of the defendant's tenants, their children or third parties. There was no testimony, however, from which the court can determine that the tenants who testified were responsible for the rodent or roach infestations with which these buildings were plagued, or for the use of flimsy doors, or door frames, leaking roofs or inadequate garbage removal. Mr. Prestia bought these buildings as an investment. He did not inspect them before purchase. He viewed these buildings as an excellent opportunity to make money. While the trial court decision in Conaway v. Prestia was rendered in June, 1981, Mr. Prestia took no steps to obtain certificates of occupancy for these buildings until 1983. CT Page 5735
Since C.U.T.P.A. allows the court, in its discretion, to award punitive damages, in addition to "simple" damages, Hinchliffe v. American Motors Corp., 184 Conn. 607, 617 (1981), the court must consider whether defendant's conduct revealed "a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . ." Gargano v. Heyman, 203 Conn. 616, 622 (1987) (Citations omitted). Perhaps the most egregious conduct of the defendant involved allowing the oil to run out in his buildings, insufficient attention to the need for regular extermination for rodents and roaches and clean up of common areas. The repairs his workmen did were often cosmetic and since problems were often structural, such as leaks in roofs or rusted pipes, the problems recurred. Some of the defects posed serious health risks, such as gas leaks form improper stove installations, water leaks into electrical outlets and the presence of lead paint in concentrations ten times the permissible level. While Mr. Hamilton, the city's Health Director, testified that Mr. Prestia eventually addressed and abated violations brought to his attention, he also testified that he had to go back to the properties several times before compliance was achieved. He discussed with Prestia ways of abating problems with rodent harborage (rats) by using smaller dumpsters, allowing more frequent refuse collection, and other means. While defendant complained of actions of his tenants and their guests, the garbage problems which contributed to the presence of rats were not in individual units but in the use of large dumpsters in the backyard. That issue was raised regarding the Beaver Street properties in February, 1982. Yet, in April, 1983, a city sanitarian who inspected 161 Broad Street, a 12 unit building, found no garbage receptacles provided for tenants outside the building despite defendant's knowledge that inadequate refuse receptacles outside are directly related to rodent infestation. Mr. Prestia testified that his purchase of these properties doubled the number of units he owned. Until early 1982, most of his time was spent at others of his properties. He left the running of these properties to his son and superintendents on the premises. Repairs were accomplished by defendant's employees. While defendant attributes much of his difficulty with his tenants to the presence of a tenant organizer for Citizens for Action in New Britain, Ms. Lugo first met with his tenants in late 1982. The city inspections were done on Beaver Street over a year before (see Plaintiffs exhibit B) and revealed violations which Mr. Hamilton characterized as relatively serious. Even if some of the problems cited in the inspector's reports could be attributed to vandalism or tenant neglect, structural inadequacies were not addressed by defendant and were not amenable to cosmetic solutions. Failure to install chimneys when heating systems were changed from oil to gas on gas, or to provide for adequate garbage removal, or to provide door frames adequate to hold a dead bolt lock in a crime ridden neighborhood constitute at least reckless indifference to the rights of tenants to habitable and reasonably secure dwellings. Punitive damages are appropriate in this case. The court finds the members of the plaintiff class entitled to ten per cent of the rents collected over the period covered by this litigation, $14,200, as punitive damages. CT Page 5736
To recap actual damages awarded to individual class members:
 Luz Miranda $500 Sonia Alicea $216 Anilda Sanchez $312 Juana Corrido $320 Maria Medina $459 Sacorro Guitierez $200 Evelyn Santos $458 Duryce Cole $760 Cheryl Ciccolella $115 Paulino Centeno $ 30 Migdalia Artiz $280
A hearing is to be scheduled on attorney's fees.
SUSCO, J.